Barbara A. Rohr, SBN 273353
**FARUQI & FARUQI LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone:     (424) 256-2884
Facsimile:      (424) 256-2885
Email: brohr@faruqilaw.com

**[Additional counsel on signature page]**

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY LU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RELYPSA, INC., DANIEL K. SPIEGELMAN, JOHN P. BUTLER, PAUL J. HASTINGS, KENNETH J. HILLAN, M.B.Ch.B., DAVID W.J. MCGIRR, JOHN A. ORWIN, THOMAS J. SCHUETZ, M.D., Ph.D., and HELEN TORLEY, M.B.Ch.B., M.R.C.P.,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Danny Lu ("Plaintiff"), by and through her undersigned counsel, brings this stockholder class action on behalf of herself and all other similarly situated public stockholders of Relypsa, Inc. ("Relypsa" or the "Company") against Relypsa, Daniel K. Spiegelman, John P. Butler, Paul J. Hastings, Kenneth J. Hillan, David W.J. McGirr, John A. Orwin, Thomas J. Schuetz, and Helen Torley, the members of Relypsa's board of directors (the "Board" or the "Individual Defendants"), for violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S,C. §§78n(d)(4) 78n(e), 78t(a), and United

States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9"), in connection with the acquisition of Relypsa by Galenica AG, and Vifor Pharma USA Inc. ("Vifor" or "Merger Sub," collectively with Galenica AG, "Galenica"). Plaintiff alleges the following based upon personal knowledge as to herself, and upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1.      This shareholder class action arises because Relypsa's board forced through a sale of the Company in order to reap personal benefits they negotiated with the Buyer to the detriment of Relypsa's public stockholders.  The Board pushed through a merger pursuant to which the Buyer plans to acquire 100% of the outstanding shares of Relypsa common stock through an all-cash tender offer (the "Tender Offer") followed by a second-step merger (the "Proposed Transaction").  The Buyer has offered Relypsa investors $32.00 per share in cash, or a total of approximately $1.53 billion (the "Offer Price" or "Merger Consideration").   The Agreement and Plan of Merger, is dated July 20, 2016.

2.      The Recommendation Statement on Schedule 14D-9 was filed on August 4, 2016 (the "Recommendation Statement").  In violation of Sections 14(e), 14(d)(4) and 20(a) of the Exchange Act, the Recommendation Statement contains incomplete and materially misleading information and omits certain information, which renders the information disclosed materially false or misleading regarding: (i) the process leading to the Proposed Transaction, including certain conflicts of interest; (ii) the financial analyses conducted by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA") and Centerview Partners LLC ("Centerview"), in support of their respective fairness opinions; and (iii) a fair summary of the basis for the assumptions underlying Relypsa's projections.

3.      Despite the fact that the $32.00 Offer Price undervalues Relypsa's future standalone prospects, the Company's Board members have agreed to support the Proposed

Transaction because it will allow them to quickly liquidate their Relypsa stock for a significant profit.

4.     The Proposed Transaction undervalues Relypsa's prospects and is the result of an unfair, truncated and conflicted sale process.  Indeed, even after the transaction was announced both Wedbush and Guggenheim put price targets on the Company of $51.00 and $49.00 per share respectively, well above the inadequate $32.00 Offer Price.  In addition, the projections provided to Relypsa's bankers to permit them to prepare a so-called "fairness opinion," were not reasonably prepared and undervalued the Company because, among other things, they ignore the revenue potential associated with Relypsa's anticipated evergreening of the nine patents associated with Relypsa's key drug Veltassa, assume Relypsa will incur **$836 million** in research and development costs between 2016 and 2032, but receive no benefits whatsoever from those expenditures and assume the Company will incur over $13 million in annual stock-based compensation expense at a time when the Company's free cash flows are declining by over 60% per year.

5.     The Offer Price is also particularly inadequate given the tremendous value Galenica expects to reap from the deal, including the ability to spin off its Vifor Pharma unit which already owns the rights to sell Relypsa's key drug Veltassa outside the United States.

6.     In a joint press release touting the Proposed Transaction to Relypsa's stockholders, Galenica noted that the Proposed Transaction "is expected to significantly strengthen Vifor Pharma ahead of the planned division of the Galenica Group into two independent companies in 2017, with an extensive specialist product portfolio to include both the intravenous iron deficiency treatment Ferinject (ferric carboxymaltose) and Veltassa."

7.     Defendants have now asked Relypsa's stockholders to support the Proposed Transaction and tender their shares in the Tender Offer based upon the materially incomplete and misleading information Defendants disseminated to them via the Schedule 14D-9 Recommendation Statement.

CLASS ACTION COMPLAINT

8. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Relypsa stockholders before the expiration of the Tender Offer, currently *set for August 31, 2016*, or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## PARTIES

9. Plaintiff Danny Lu is, and has been at all relevant times, a stockholder of Relypsa common stock.

10. Defendant Relypsa (NASDAQ: RLYP) is a biopharmaceutical company spearheading the discovery, development and commercialization of polymer-based medicines to treat conditions that are often overlooked and under treated. Defendant Relypsa is a Delaware corporation headquartered in Redwood, California. Relypsa has over 400 employees. Relypsa has a unique platform that includes a proprietary high-throughput chemistry process, enabling it to efficiently explore thousands of potential polymer medicines for each disease it seeks to address. Relypsa's polymers are non-absorbed, meaning they act within the gastrointestinal tract and do not get absorbed into the bloodstream or other parts of the body. Relypsa's polymer technology may be able to address many health conditions in need of viable treatment options.

11. Defendant Daniel K. Spiegelman is and at all material times was the Chairman of the Company's board.

12. Defendant John P. Butler is and at all material times was a member of the Company's board.

13. Defendant Paul J. Hastings is and at all material times was a member of the Company's board.

14. Defendant Kenneth J. Hillan, M.B.Ch.B. is and at all material times was a member of the Company's board.

CLASS ACTION COMPLAINT

15.     Defendant David W.J. McGirr is and at all material times was a member of the Company's board.

16.     Defendant John A. Orwin is the CEO of Relypsa and at all material times was a member of the Company's board.

17.     Defendant Thomas J. Schuetz, M.D., Ph.D. is and at all material times was a member of the Company's board.

18.     Defendant Helen Torley, M.B.Ch.B., M.R.C.P. is and at all material times was a member of the Company's board.

19.     The Defendants referred to in ¶¶ 11-18 above are collectively referred to herein as the "Board" or the "Individual Defendants."

20.     Non-party Galenica AG is a public limited company existing under the laws of Switzerland.

21.     Non-party Merger Sub is a Delaware corporation and a wholly owned subsidiary of Galenica.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(d), 14(e) of the Exchange Act and Rule 14d-9 promulgated thereunder and Section 20(a) of the Exchange Act.

23.     Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this

CLASS ACTION COMPLAINT

District; and (ii) Relypsa has its principal place of business in Redwood City, California, within this District.

**SUBSTANTIVE ALLEGATIONS**

**A.**     **Relypsa's Strong Growth Prospects**

25.     The announcement of the Proposed Transaction comes just as the Company is set to reap billions in profits from its first new drug Veltassa.

26.     Veltassa was accepted as a new drug application ("NDA") by the FDA on December 15, 2014.  Veltassa is also referred to as Patiromer for Oral Suspension ("Patiromer FOS") and is used to treat hyperkalemia, a serious condition defined as abnormally elevated levels of potassium in the blood.  In announcing the FDA's acceptance of an NDA for Veltassa, the Company's president and CEO stated:  "Acceptance of our NDA is a significant milestone that triggers greater intensification of our steps toward commercial readiness. . . . If approved, we believe Patiromer FOS may be the first new therapeutic innovation available to treat patients with hyperkalemia in both acute and chronic settings in over 50 years.  We also believe there is a significant unmet medical need for patients, particularly as it relates to chronic therapy, and we are planning for broad access to the drug.  Based on the robust data which demonstrated the early onset of action and favorable safety profile for up to one year, we believe that Patiromer FOS, if approved, will become an important new treatment option for patients with hyperkalemia."

27.     On March 14, 2015, the Company announced Phase 2 data showing efficacy of Veltassa in heart failure patients with chronic kidney disease.

28.     The Company announced more encouraging news on March 26, 2015, when it disclosed that data from a Phase 3 clinical program showed that Veltassa was effective in reducing potassium levels and preventing a recurrence of hyperkalemia in patients with advanced (stage 4-5) chronic kidney disease receiving ongoing treatment with renin-angiotensin-aldosterone system inhibitors.

CLASS ACTION COMPLAINT

29. On July 14, 2015, Relypsa announced that one-year data from the Phase 2 AMETHYST-DN trial of Veltassa showed that patients with chronic kidney disease (CKD) and mild or moderate hyperkalemia who were treated with Veltassa had statistically significant decreases in blood potassium levels from baseline at four weeks ($p < 0.001$; primary endpoint). Veltassa quickly reduced potassium levels, with significant reductions at the first post baseline assessment, approximately 48 hours after treatment stated ($p < 0.001$). Patients maintained normal blood potassium levels through 52 weeks of treatment. Veltassa was well tolerated when taken for up to one year.

30. On August 10, 2015, Galenica took the first step towards its proposed acquisition of Relypsa when it acquired an exclusive partnership to commercialize Veltassa in Europe. Under the terms of the agreement, Relypsa received an upfront cash payment of $40 million and became eligible to receive payments of up to $125 million upon achieving certain regulatory based milestones. In addition, Relypsa received a tiered double-digit royalty on net sales of Veltassa in licensed territories.

31. On October 21, 2015, Relypsa announced that Veltassa had been approved by the FDA for the treatment of hyperkalemia. In the press release, Relypsa's president and CEO stated: "The FDA approval of Veltassa represents approximately a decade of research by dedicated scientists and doctors, and underscores Relypsa's commitment to developing polymer-based treatments for people with conditions that are often overlooked and undertreated."

32. On November 6, 2015, Relypsa announced the results of a sub-group analyses from Phase 3 OPAL-HK Trial of Veltassa. Relypsa explained that data showed Veltassa significantly reduced and maintained control of blood potassium levels in hyperkalemic CKD patients age 65 and older who were also receiving renin angiotensin aldosterone system (RAAS) inhibitor therapy. A separate post-hoc analysis also from the OPAL-HK trial showed Veltassa's efficacy in treating hyperkalemia was not diminished by concomitant use of diuretics. Veltassa

was well tolerated in both sub-groups, with mild-to-moderate constipation as the most common adverse event.

33.     On December 21, 2015, Relypsa announced that Veltassa was finally available to be purchased in the United States.

34.     On January 25, 2016, Relypsa announced the results of a drug-drug interaction study which demonstrated Relypsa's efficacy was not affected by its administration alongside other drugs.

35.     Veltassa was an instant success.   In announcing first quarter 2016 results Relypsa's president and CEO stated: "[w]e made great progress in our first full quarter with Veltassa on the market.  We saw solid month-over-month growth of prescriptions, reported early success with payers, including agreements with the two largest pharmacy benefit managers, and have had a positive reception from treating physicians."  Relypsa also disclosed that due to the recent submission of an MAA requesting European approval of Veltassa, the Company was another step closer to bringing Veltassa to patients outside the United States.

36.     The Company received more good news on May 27, 2016, when Astra Zeneca announced that the FDA issued a Complete Response Letter regarding the NDA for ZS-9, a potentially competing product to Veltassa, explaining that the FDA decided the NDA to market ZS-9 would not be approved in its present form.

37.     As of the merger announcement Relypsa has successfully obtained 9 patents associated with Veltassa.  The patents and patent applications relating to Veltassa are all owned by Relypsa.  The issued composition of matter patents (U.S. Patent Nos. 8,147,873, 8,282,913, and 8,337,824), if the appropriate maintenance fees are paid, are expected to expire between 2026 and 2030.   The issued methods of treatment patents (U.S. Patent Nos. 7,556,799, 8,216,560, 8,287,847, 8,475,780, 8,778,324 and 8,889,115), if the appropriate maintenance fees are paid, are expected to expire between 2024 and 2027.

CLASS ACTION COMPLAINT

38.     Relypsa is also in the process of evergreening its patent portfolio.   Relypsa currently has at least two pending patent applications, and disclosed in its recommendation statement that it intends to spend $836 million on research and development over the next 10 years.  Relypsa also has at least two currently pending patent applications (publication numbers 20130189216 and 20130131202).

**B.      The Flawed and Conflicted Sale Process**

39.     For several years Relypsa rebuffed opportunities to explore strategic alternatives and refused to engage Centerview as its financial advisor more than once.

40.     However, that all changed when Galenica expressed interest in Relypsa in April 2016.  Unlike other potential purchasers who had been ignored, Relypsa swiftly responded to Galenica's expression of interest and its President and CEO met with Galenica on April 18, 2016, an opportunity not afforded to any of the other interested potential purchasers at that time.

41.     On April 25, 2016, the Board met to discuss Galenica's interest in acquiring the Company at an unspecified price and agreed to permit Galenica to conduct due diligence.

42.     Then, on May 19, 2016, after giving Galenica a significant temporal advantage in the sale process, the Company finally entered into a confidentiality agreement with Party B, but continued to consciously disregard other potential purchasers.

43.     In fact, although the Board discussed five potential counterparties (including Galenica, Party A and Party B) on May 23, 2016, the Board illogically ignored Party A and the three other potential purchasers.  Subsequently on May 27, 2016 the Board decided to contact Parties A and C, but continued to ignore two other potential purchasers it had identified and in fact never contacted them at any point during the sale process.

44.     Even more troubling, rather than retain an independent financial advisor, on May 27, 2016, the Board approved the retention of Centerview which it knew had longstanding ties to Galenica and was even providing advice related to Galenica's planned spinoff of Vifor which the Board knew was made far easier if Galenica was able to acquire Relypsa.

CLASS ACTION COMPLAINT

45.     Strangely, and in recognition of Centerview's conflict of interest, later the same day the Board reached out to Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA") to provide a second fairness opinion.  Obviously if the Board truly believed Centerview had a conflict of interest it should have not wastefully engaged Centerview.  Conversely, if the Board did not believe Centerview was impermissibly conflicted it should not have wastefully retained a second duplicative financial advisor.  Even more troubling, while the Board permitted Centerview to run the sale process it still negotiated a fee with BofA that was partially contingent on a sale of the Company.  If the Board truly wanted a non-conflicted second fairness opinion from BofA it should have entered into a fee arrangement that was not impacted by the success or failure of an acquisition of the Company.

46.     As the sale process moved forward the Board permitted its conflicted financial advisor, Centerview, rather than BofA to lead the sale process.

47.     Then on July 20, 2016 the Board agreed to Galenica's unreasonably low offer of $32.00 per share even though the Board had repeatedly indicated that "an offer closer to $34.00 per Share was more reflective of the value of Relypsa."

C.     **The Proposed Transaction Undervalues Relypsa Shares**

48.     On July 21, 2016 Relypsa and Galenica issued a press release announcing the Proposed Transaction.

49.     The $32.00 Offer Price that Relypsa's public stockholders stand to receive is insufficient, as it fails to adequately account for the Company's strong financial prospects and the tremendous benefits Galenica will reap from the Merger.

50.     The Proposed Transaction was not warmly welcomed by analysts.  After the announcement of the Proposed Transaction on July 21, 2016, Wedbush put a $51 price target on the company and explained:

> While we see $32 per share as an acceptable offer, we believe there is room for at least one additional bidder.  On April 7th, a Reuters news article indicated that Relypsa received multiple overtures from potential buyers.  With millions of CKD and heart

failure patients experiencing hyperkalemia, we estimate the potential for peak annual sales to reach over $1 billion just in the U.S. and view the offer of $1.53 billion as approximately one-time peak sales. We note a comparable transaction when competitor ZS Pharma was acquired by AstraZeneca (AZN) for $2.7 billion in cash announced on November 6, 2015 citing current estimates for worldwide peak annual sales of ZS-9 to exceed $1 billion. Our $51 price target implies $2.285 billion equity value. A likely additional suitor in our view, Sanofi (SNY) sells a polymer-based (sevelamer) phosphate binder and reported $935 million in sales during 2015. On August 10, 2015 Relypsa and Sanofi announced a two year detailing agreement in which Sanofi provides commercial support from their established nephrology sales force and receives a service fee and potential incentive payments. We view Veltassa as a natural fit for Sanofi adding another nephrology drug to their polymers are not absorbed marketing theme.

51. Likewise, on the same day Guggenheim put a $49.00 price target on the Company and explained:

**Offer price implies more modest commercial prospects than our forecast.** Our PT is based on a DCF analysis of the commercial opportunity for Veltassa, to which we apply a 10% WACC to cash flows through 2028 and a 2.5x terminal EBITDA multiple implying perpetual FCF growth of -16% thereafter, an expected rate after Veltassa patent exclusivity lapses. According to our model, the $32/share offer represents anticipated peak U.S. sales of approximately $1B in 2028 (penetrating approximately 8% of our estimated U.S. population of hyperkalemic CKD and heart failure patients) as compared with our baseline assumptions of $1.3B in peak U.S. sales (approximately 9% of U.S. hyperkalemia patients), though our model also contemplates expenses in excess of the "low-triple-digit" investment referenced by Vifor Pharma. Incorporating this data point into our model as reflecting potential synergies, we would see the purchase price reflecting peak U.S. sales of approximately $870M (7% market share) and therefore about a 1.8x sales multiple.

* * *

**Offer price well shy of comparable valuation for ZS Pharma buy out.** The $1.5B offer is substantially lower than the $2.7B AstraZeneca (AZN, NC, $30.57) paid to acquire ZS Pharma that was announced in November 2015. At that time, AZN expressed the belief that global sales of ZS-9 could exceed $1B per annum, an estimate we believed contemplated modest market share capture, based on population demographics. We translated the ZS

11

Pharma purchase price to a sales pace, applied RLYP's patiromer patent exclusivity and adjusted for PTS and likely tax differences. That analysis, albeit somewhat crude, yielded a fair value for RLYP shares in the $60-$65 range to an acquirer, implicitly assuming Veltassa and ZS-9 have approximately equal prospects for treating hyperkalemia.

52.     In sum, Galenica will capitalize on Relypsa's significant prospects for future growth and profits while depriving the Company's stockholders of the ability to maintain equity in the post-Merger company, and without fairly compensating them for their Relypsa shares.

**D.     The Defendants Failed to Adequately Disclose All Material Information Concerning the Merger Necessary To Ensure Statements In the Recommendation Statement Are Not Materially False Or Misleading.**

53.     Defendants have now asked Relypsa stockholders to accept the inadequate Merger Consideration by tendering their shares in the Tender Offer based upon materially incomplete and misleading information in the 14D-9.  It is critical that stockholders receive complete and accurate information about the Proposed Transaction prior to deciding whether to tender their shares.  To date, however, Defendants have failed to provide Relypsa stockholders with such information.

54.     In describing the work Centerview performed for Galenica the Recommendation Statement merely states that Centerview would receive a fee in a "fixed amount" in connection with its advice related to the spinoff of Vifor, which the Recommendation Statement misleadingly describes as an "unrelated financial advisory matter[]" and that "Centerview is entitled to receive fees totaling **as much as** CHF 8.5 million for its prior work and ongoing work for parent." (emphasis added)  Stockholders are entitled to know if Centerview's fee is affected in any manner if the Vifor spinoff is successful.  This is material, because Galenica's proposed acquisition of Relypsa will better enable it to spinoff Vifor, as a result stockholders are entitled to a specific description of Centerview's fee in connection with that engagement so they can assess Centerview's conflict of interest.  The Recommendation Statement also conveniently omits that Centerview has a 10 year relationship with Galenica.  Even more troubling

CLASS ACTION COMPLAINT

Centerview has provided advice to Galenica regarding potential acquisition targets.  Although the Recommendation Statement does indicate that Centerview provided advice to Galenica related to "potential future acquisitions by Galenica" and that Centerview was "not representing Galenica in connection with a potential acquisition of Relypsa or any related matters" that does not mean Centerview did not provide advice related to an acquisition of Relypsa or an alternative thereto for which it was not formally engaged.  Therefore, the Recommendation Statement was required to disclose whether Centerview provided any advice to Galenica for which it was not formally engaged related to an acquisition of Relypsa or any alternative thereto.  Without this information the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

55.    Stockholders are also entitled to know whether Centerview used any information or provided any advice related to the proposed Relypsa transaction in connection with its advice related to Galenica's planned spinoff of Vifor.  This information is material because it relates to whether Centerview has an improper conflict of interest or misappropriated confidential information and is necessary to ensure the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

56.    Moreover, the Recommendation Statement does not disclose whether any member of the Centerview team, was currently or previously providing advice to Galenica.  This information is material because it relates to the extent of Centerview's conflict of interest and is necessary to ensure the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

57.    Page 17 of the Recommendation Statement indicates that "[o]n May 22, 2016, John Butler, a member of the Relypsa Board, delivered an e-mail to Mr. Spiegelman, Mr. Orwin and Ronald Krasnow, Senior Vice President and General Counsel of Relypsa, stating that, at that time, Mr. Butler intended to recuse himself from the meeting of the Relypsa Board on the following day and any future discussions to the extent they related to Galenica's proposal to

CLASS ACTION COMPLAINT

acquire Relypsa or any related transaction process."  The Recommendation Statement wholly fails to explain, however, why Mr. Butler recused himself and whether he believed he may have a conflict of interest in connection with the Proposed Transaction.  Therefore, this information is necessary to ensure the statements related to Mr. Butler's recusal are not false and misleading.

58.     Although page 45 contains a summary of BofA's discounted cash flow analysis and includes the definition of unlevered free cash flows used by BofA, which makes clear BofA did not atypically treat stock-based compensation as a cash expense, the summary of Centerview's discounted cash flow analysis on pages 38 and 39, however, does not disclose whether Centerview reduced Relypsa's value by treating stock-based compensation as a cash expense.   This disclosure is necessary to ensure stockholders or not mislead by the value resulting from BofA's discounted cash flow analysis.

59.     The summary of Relypsa's projections on pages 48 through 62 of the Recommendation Statement is woefully inadequate because it does not provide stockholders a fair summary of the reasons for certain unrealistic assumptions in each of the projection sets.  By way of example, each of the projection sets assumes the Company will go into a death spiral after exclusivity for its drug Veltassa expires in 2030.  However, the Recommendation Statement provides stockholders no information why the Company would not benefit from the evergreening of its patent portfolio.  Indeed, Relypsa appears to be in the process of evergreening its patent portfolio currently as it has at least two pending patent applications.  In addition, all of the projections assume Relypsa will incur $835 million in research and development costs, but at the same time project for no benefits from that cost.  As a result, the Recommendation Statement should explain why the Company is incurring research and development costs and not incurring any benefits.  Indeed, if the Company does not intend to spend research and development money on evergreening its patent portfolio and attempting to create new drugs those expenses should not be included in the projections which would increases the Company's future value.  Thus, stockholders are entitled to a fair summary of the basis for this illogical assumption.  The

CLASS ACTION COMPLAINT

projections also ignore the possibility that a generic drug manufacturer might not be able to determine the process by which Relypsa manufactures Veltassa and therefore not have the ability to obtain approval through an Abbreviated New Drug Application, which would have the effect as a practical matter of essentially extending the exclusivity period as a generic manufacturer works through a slower drug approval process.  Therefore, stockholders are entitled to a fair summary of the basis for management's assumption that this would not occur.  Moreover, each of the projection sets assumes the Company will incur in excess of $13 million in annual stock based compensation expense between 2030 and 3032 (which was expected to increase each year).  But, the projections also assume that during those years the Company would be in a death spiral.  Accordingly the Company should explain why stock-based compensation expense is increasing at a time when the Company's stock would in theory be dropping in value causing all or some of the stock options to be underwater and therefore worthless.  In sum, without a fair summary of the illogical assumptions in Relypsa's projections stockholders will be misled regarding the weight to afford Relypsa's projections.

## **CLASS ALLEGATIONS**

60.    Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 individually and on behalf of all other holders of Relypsa common stock (except defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions as more fully described herein (the "Class").

61.    This action is properly maintainable as a class action.

62.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are thousands of members in the Class.  As of August 1, 2016, there were (i) *44,882,597* shares of Common Stock issued and outstanding; (ii) 4,753,020 shares issuable upon the exercise of outstanding options; (iii) 997,523 shares issuable

CLASS ACTION COMPLAINT

upon the vesting of outstanding restricted stock units; (iv) 255,149 shares issuable upon the exercise of outstanding and unexpired warrants; and (v) 188,338 shares estimated to be subject to issuance pursuant to Relypsa's 2013 Employee Stock Purchase Plan, as amended.  The holders of these shares of stock are believed to be geographically dispersed throughout the United States. All members of the Class may be identified from records maintained by Relypsa or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

63.     Questions of law and fact are common to the Class and predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:  (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Recommendation Statement in violation of Section 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer  irreparable harm if the Proposed Transaction is consummated as presently anticipated.

64.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

65.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude maintenance as a class action.

CLASS ACTION COMPLAINT

## COUNT I

### Claim for Violations of Section 14(e) of the Exchange Act
### Against All Defendants

67.     Plaintiff repeats and realleges each allegation set forth herein.

68.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. § 78n(e).

69.     As discussed above, Relypsa filed and delivered the 14D-9 to its shareholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

70.     During the relevant time period, Defendants disseminated the false and misleading 14D-9 above.  Defendants knew or recklessly disregarded that the 14D-9 failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     The 14D-9 was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Exchange/Tender Offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

72.     In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 14D-9, Defendants were aware of this information and their obligation to disclose this information in the 14D-9.

CLASS ACTION COMPLAINT

73.     The omissions and incomplete and misleading statements in the 14D-9 are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal.   In addition, a reasonable investor would view the information identified above which has been omitted from the 14D-9 as altering the "total mix" of information made available to shareholders.

74.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

75.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

### Claim for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants

76.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

77.     Defendants have issued the 14D-9 with the intention of soliciting shareholder support for the Proposed Transaction.

78.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.   Specifically, Section 14(d)(4) provides that:

CLASS ACTION COMPLAINT

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

79.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof .

80.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

81.      The 14D-9 violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

82.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

83.     The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

CLASS ACTION COMPLAINT

84.     Plaintiff and the members of the Class have no adequate remedy at law.

**COUNT III**

**Claims for Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

85.     Plaintiff repeats and realleges each allegation set forth herein.

86.     The Individual Defendants acted as controlling persons of Relypsa within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Relypsa, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14D-9 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

87.     Each of the Individual Defendants were provided with or had unlimited access to copies of the 14D-9 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The 14D-9 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

89.     In addition, as the 14d-9 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.

The 14D-9 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

90. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91. Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Tender Offer and Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement and obtain increased merger consideration for the Company's stockholders;

C. In the event Defendants consummate the Proposed Transaction, awarding damages to Plaintiff and the Class;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 12, 2016

**FARUQI & FARUQI, LLP**

/s/ *Barbara A. Rohr*_____ __
Barbara A. Rohr SBN 273353
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884

Facsimile:  (424) 256-2885
Email:  brohr@faruqilaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Derrick B. Farrell
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel: (302) 482-3182
Fax: (302) 482-3612
Email: dfarrell@faruqilaw.com

        -and-

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 601-2610
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, _Danny Lu_ ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Relypsa, Inc. ("Relypsa") and the other named defendants and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and Monteverde & Associates PC or any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Relypsa securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this _11_ day of August, 2016.

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 12/08/2015 | 10,000 shares |
| Purchase | 12/09/2015 | 10,000 shares |
| Purchase | 03/02/2016 | 5,000 shares |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |